and I guess Mr. Taylor, you're up first, whenever you're ready. You'll have to speak up a little bit. Pick up speaker and then speak. We're across the room. I'm going to try to reserve five minutes for rebuttal. That's fine. The district court below dismissed the complaint in this case because it concluded that the plaintiff didn't plausibly allege that she had suffered an Article III injury when the defendants personally discriminated against her based on a protective characteristic. That conclusion is wrong and should be reversed. This court should hold at a minimum that the plaintiff here has standing because she has alleged two things. Number one, she's alleged that she was personally subjected to unequal treatment by the defendants based on a protective characteristic of hers in violation of her individual rights. She's alleged number two, that this personal unequal treatment concerns something that matters to her in a concrete way, namely access to and information about housing. When these two things are true, personal unequal treatment that somebody has suffered as to something that matters to them in a concrete way, this court and the U.S. Supreme Court have consistently held that the plaintiff has standing to challenge the unequal treatment. I agree with you that in many ways to me this case entirely comes down to what do the words personally denied equal treatment mean, those words from Allen versus Wright and the Supreme Court. I get a sense when I read the briefs that the parties are just talking past each other because you say what happened here is obviously being personally denied equal treatment. They say it's not. I guess maybe first concrete question, what is the most analogous case from your perspective? Because the cases I can think about are I applied to a school and I was evaluated under different criteria or I wanted to bid on a contract and I was subject to different criteria. What is the closest case to saying I wanted to see an advertisement that I didn't see based on a protective criteria? I think this is kind of a modern version of a classic hearing case where here you have a housing company that says to Facebook don't send this information. I don't want to keep budget, but speak up. Speak up. Yes, I will. Be an orator. Yeah, I mean you have here a housing company that made an express statement to Facebook. We want to send this information to anyone who's interested except people who are older than 40. And solely because of that express statement indicating a clear preference to target. But what's the closest case? So I mean you might say Havens, but in Havens the person who was found to have standing was a person who was lied to personally. They said do you have any housing available? And they were told no and that was a lie. So that isn't really the case here either. So again, I guess I'll just ask it one more time. What is the closest case to saying I wanted to see ads that I did not see and that means I have an Article III injury? Well, I mean one case you could look at is the Comer case out of the Second Circuit. So there it wasn't ads, but it was information about housing opportunities that the plaintiff wasn't told about. And she alleged in that case that she would have potentially made a different housing decision had she been made aware of that information. When you say wasn't told about as in someone did send her information about or she went in and said what housing opportunities do you have and someone left off one of them? I think it's closer to the latter, but I mean I think all of the discriminatory advertising cases. That's a personal engagement. When somebody seeks it out, but she says it's a little strange the way she's alleged her complaint. You guys have all alleged the complaint. She says she was searching and was denied the opportunity, but yet her search never constituted any affirmative act. She basically was relying on her while she was using Facebook that a pop-up ad would be one that she'd be interested in. And so there was no suggestion that she personally requested something was denied something. This is a little bit like driving by on the highway and seeing a billboard for a community that serves people 55 years and older. That applies to some and doesn't apply to others, but she didn't do a single search according to what I can. She didn't push a button and say I could have looked here or looked there. She was waiting passively for Facebook to give her an ad that was appropriate. And it's a strange abstraction. In other words, these cases you cite are where people actually affirmatively were seeking something and were denied it or lied to or somehow personally affected. I think the district court judge was troubled by that aspect. I think that's what was at the core of his ruling, don't you think? Yeah, and I'm happy to take on the district court's rationale. I will just say in direct response to your question, Judge Niemeyer, I just don't think it's an accurate reading of the complaint to say that the only thing she did as part of her housing search was sit passively at her computer and wait for ads to pop up. I mean, if you look at J.A. pages 14 and 15. Did she actually go and search on Google or any other platform and look for rental properties? Yeah, so she alleged, this is at page 14 of the joint appendix, that she regularly searched for rental housing in the D.C. metropolitan area during this time. And there's no evidence that in searching for that, she was denied anything. No, that's right. But she was only denied the opportunity to see passively, to see ads that pop up while she uses Facebook. No, what she was denied was the opportunity to learn about available housing that she alleges she had no idea about until she was told about the discriminatory practice. But you didn't allege that she went to the site and could only see certain types or she went to apartments.com or the many, many sites for rentals that are available, that she was denied access to anything. You don't allege that. You allege only that a pop up ad for her age group didn't show up on Facebook. I think that misunderstands, with respect, Judge Nimai, the nature of the injury. And this really gets to the core of the district court's analysis. Well, I'm trying to focus on the allegations first. I'm happy to focus on the allegations. I'm not running away from them. You can look at pages 14 and 15 of the joint appendix and then 40 to 45, and I'll just rattle off what I think are the most pertinent allegations. She was regularly searching for rental opportunities, both online and offline. She regularly used Facebook and visited properties to consider renting. She was not aware of these particular housing opportunities. All right, let's take those allegations. Is there any suggestion in those activities she was denied access to any ad or property? Yeah, this very case. This is not a search. These are passive ads that appear on Facebook. The search would mean going out affirmatively and pushing a button or driving by. But that doesn't mean that the information was wholly irrelevant. No, but the discrimination, if you searched it out and it was denied to you, that's a different type of injury. I agree that that would be more concrete. But here, I mean, the defendants came to her. They specifically said, when they were interacting with Facebook, don't send this information, this housing information, regardless of whether people will care about it, to anyone over 40, even if they're in the geographic area. And that is the only reason why she was not able to see this housing information. So can I ask you, could a department company decide to advertise exclusively on TikTok? I think, I mean, the question there, that's a different theory. I mean, the question on the merits would be whether that advertising campaign to an objective reader would indicate a preference. I guess another way to say it is, what would an individual need to establish standing to challenge an employer, sorry, a housing company advertising only on TikTok? So I think that is, I think you can answer that hypothetical either way and still rule in our favor here. I'll give my best crack at the hypothetical. I think you probably don't have as clear an argument in that case that someone has been personally subjected to unequal treatment, because all the defendant has done is advertise. And I guess the answer is anybody who wants to see those. I thought it seems to me that what the defendant could say is anybody who wants to create a TikTok account can create a TikTok account. And then your response is, but you know there are no old people on TikTok. And you say, well, that's not our problem. That's just how TikTok works. Well, I think that certainly would be their defense on the merits. And they might very well win that case. But I think. Well, no, I mean, if a person who didn't have a TikTok account brought such a lawsuit, I imagine the first question would be, did you ever try to create a TikTok account? Well, I think the person would have to be first, you know, an older person who claims that this is tantamount to age discrimination. And I think if that person could show that, look, they were in the same geographic market for housing. They were looking at the housing for housing opportunities at that time. They were not aware of the housing opportunities that were advertised on TikTok. And had they seen those opportunities, they would have qualified for them and applied to them and obtained them. Everything that we have in the complaint here, I think they would have an argument that if there was no other advertising that was done, they at least have standing to challenge practice, even if it's only standing to lose that case. And I think in our case, it's even clearer. There is a statement that the defendants made to Facebook to exclude everyone who is above a certain age from even being able to receive the information. And I think what the district court got wrong, it really is a multitude of mistakes that the district court made. But number one is that the district court just misunderstood the nature of the injury. It's not the inability, and the Supreme Court has made this very clear, to ultimately obtain the benefit, whether it's access to the housing or information about the housing. It's just being able to compete on a level playing field. The Supreme Court has made that clear in the general contractor set-aside cases and affirmative action cases. Judge Niemeyer, an opinion that you joined a number of years ago, Price v. City of Charlotte. I'm embarrassed to say we didn't cite it in our briefs. I wish we did. Made the same point. The plaintiffs in that case were white police officers who concededly were not eligible to compete. This is not a case about competing on an even playing field. You have to have an actual injury. And your claimed injury that you're focusing on this morning, it sounds like, is access to information. Right? You're saying the information, maybe it wasn't denied, but it wasn't volunteered. I would put it maybe a little bit differently. I think you're right that the information is part of the injury. Ultimately, what she wanted was to obtain housing. And the information mattered to her because it affected her ability to obtain housing. And I think in the Supreme Court most recently in a trans-union opinion, I think maybe it happened, informational injury as an Article III injury. But it specifically said if someone is requesting information, they're denied that information, and that causes them some harm. You just changed two words to me that I think is critical in this case. If she were denied something upon request, you fall within haven in some of the Second Circuit case. But if she passively, if they advertise to the whole public, only to people who are between the ages of 20 and 35, and they advertise to everybody in the whole area, and she doesn't make a request and is not denied anything. She's not personally discriminated against. The whole group is. It's a societal problem. And the standing comes when she personally makes a request and is denied it, or she is personally injured. Now, in this case, it's denying an opportunity on a limited single platform, Facebook, to see something that she can see on every platform available. She could type in the rental company's name, the apartment's name, rental names, broker's names. There's just a whole panacea of opportunity to determine whether she's being discriminated against. But just the failure to have a targeted ad pop up or a targeted ad pop up and say that's caused me injury would be a reach, wouldn't it? I don't think so. Judge Niemeyer, if I could just give you a brick-and-mortar example that I think is logically indistinguishable from this case. Imagine that instead of advertising on Facebook, an apartment complex sent an employee down to the street to pass out flyers advertising available units and maybe a deal on those units, but said don't give these flyers to anyone you see who's a minority. Only white people can get the flyers. And if someone walked by the street and they were a minority and they were interested in renting housing that otherwise would have applied for and qualified for that housing, I think it's pretty clear they would have standing to sue. And I don't think it would be a defense for the developers. They might because you're personalizing it to a person who's interested. Now, how about you take your hypothetical and there's a big sign in front of the housing that says whites only. And a person drives by and says he sees that. He's African-American. He drives by and sees that and files suit. And he says that bothered me because I wasn't, it was not offered to me. It seems to me he would have to say that he was interested in renting that unit or he was denied it or he was looking at that unit and that sign prohibited it. There's got to be some personalized injury, right? We have a couple of different responses, Judge Niemeyer. The first point is that is not different and that is not any more personalized. I mean, it's just a digital equivalent of that face-to-face interaction. It is otherwise on all fours. The second point is we do, we have alleged in this complaint. I want to let you finish your answer. But just to be clear, it's not on all fours.  It's not an ad that says no old people wanted for this apartment. It's just an ad that says we're renting an apartment. And the stigma comes at some time that's not disclosed to us in the complaint when she learns from someone else that this is how Facebook algorithms work. Right? And so that's, I mean, a stigmatic injury is very different here. But you had another answer. Well, and the ads in my hypothetical are also facially non-discriminatory. And a person who walks by and isn't handed a leaflet wouldn't have any reason to feel stigma because they wouldn't have been aware of the reason they didn't receive the ad. But if they later discovered that the reason they didn't receive the leaflet is because that complex policy to categorically exclude anyone who's a racial minority from receiving it, I don't think it would be an answer to say that the content of the ad itself is non-discriminatory. The only reason you didn't receive the ad is because of a protected characteristic. Well, then you have a question of, right, is it a personally felt stigma issue or is it everyone in society, you know, someone who lives in Alaska would also feel a stigma because, you know, these advertisements were only being handed to certain people in, you know, the D.C. area. That's right. My point was for the sign in front of the complex. Yeah, I think that is right. And we're certainly not coming to the court with a theory that would allow anyone in the country who's over the age of 50 and uses Facebook to sue these particular defendants alleging discrimination for these particular ads. It's much more particularized and concrete for that. And Judge Niemeyer, just to complete my response to your question, I mean, there are allegations in this case that rise to the level of I would have applied to XYZ. That fit within my budget. I didn't know about these opportunities. I would have applied. I wasn't made aware of them. And that's a competitive imbalance. And I think it just it. But not being made aware of them. If you made no effort at all, it's just passively. These are neutral ads. And she doesn't know how they're targeted. I mean, they could be a lot of medical ads are targeted to older people because older people suffer more medical ads and injuries than young people have more sicknesses. In other words. The problem is not that maybe it's not a good practice. The problem is whether your client, by not seeing neutral pop up ads of a particular category, discriminates against her personally. And the answer is if she pursued it and was denied it or discouraged or whatever. But she says she those ads were her entry to the whole market, which can't be so because she said she searched and drove around and she must have gone on Google. And there's no suggestion that those ads were the gateway, those opportunity. And that's the gateway to these other. Right. These other apartments that existed. Yeah. And that's I just want to be clear about this. That's not our theory. Our theory is that she was already in the market and there's a competitive imbalance. And I think the competitive imbalance. So she didn't see an ad. That's sort of a negative. It's not that she was denied anything. She didn't see an ad pop up on a particular platform, whether it's TikTok or Facebook or some other platform. But she never asked. Well, that's not I mean, that's not generally the way that ads work on the Internet. But I agree. You can go to Google and do an independent search for that. But I would just I mean, I find it a bit rich that the defendants here are suggesting that their own decision to spend money on these ads had no effect in the real world. It didn't result in people finding out about their properties and applying for those properties and ultimately securing those properties who wouldn't have otherwise done that. That's the logic of advertising. And it's frankly offensive to sort of the other side to respond with almost mock derision at the notion that someone might actually care about listening to the message that they're paying. Could an assisted living facility advertise only to persons 55 years and older? Well, I mean, I think that if someone is not in the market younger than 55 and doesn't need those services, then I think that you would have a very strong argument that that person doesn't actually have standing challenge that practice, because even if they're sort of discriminated against in a personal way because they're screened out from receiving those ads, that that discrimination is sort of just discrimination in a vacuum. It's kind of like the ADA tester case that was before this court a couple of years ago, the Griffin case, where if I may just spend a minute, I realize I'm blowing past my time here, but just for the court's benefit, the facts of that case where you had someone who was visually impaired trying to access a website for a federal credit union, the Department of Labor credit union, that she was sort of ineligible, barred by state law from being able to access those services, and claimed that the website wasn't accessible to her because of her disability, and sued based on that. And Judge Wilkinson, in a very thoughtful opinion, said, look, this isn't really being personally subjected to discrimination, because you're legally barred for an independent reason from being able to access the services, in the same way that there was a geography barrier in Allen v. Wright, and there would be a geographic barrier here if we were a blanket outside of the D.C. area. But in there, I think there was also a real risk of opening the doors and allowing for manufactured scanning. You don't have that in this case. And so I think it's meaningfully different. All right. I think you have some rebuttal time. We're a little over time already. Mr. Keneally. Thank you, Your Honor. May it please the court. My name is Michael Keneally. I represent J.B.G. Smith and I'm arguing today on behalf of all four defendants in this appeal. Before the district court, plaintiff alleged four injuries, and the district court correctly and methodically explained why each of those four did not support standing, given plaintiff's allegations. On appeal, plaintiff, at least in the appellate briefing, barely challenged that conclusion, and instead made this argument that she did not need to show an injury within those four categories, because it was enough to allege unequal treatment. Now, I don't think she's preserved that new argument for appeal, but even if she had, it would not change the analysis and not provide a basis for reversal, because even today, plaintiff's counsel admits you still need to have a particularized injury, being personally subjected to the unequal treatment, and it needs to be concrete. So I think even under the new framing in the appellate briefing, the court has to affirm the dismissal of plaintiff's case, because she cannot show both of those two requirements of Article III. Before I get to that argument, I would like to briefly address the district court's grounds for dismissing the complaint. Mr. Keneally, can I ask you two framing questions that I think are necessary to sort of set up another question I'd like to ask you? So for purposes of the standing inquiry, I suspect your clients do not agree with this, but I guess for purposes of the standing inquiry, we have to assume that what you did here was totally illegal, right? No, I disagree. For standing purposes, we don't have to assume that what you're doing is illegal? Yes, because in the following sense, Your Honor, not because of the dispute about whether she can prove the facts that she's alleged, and we agree that that's merits, but you still, if as plaintiff is doing, arguing that the legislatures of D.C. and Montgomery County have elevated to a concrete injury a particular type of statutory discrimination. Oh, no, no, I understand that legislatures can't create Article III standing where it doesn't exist. Sorry, that wasn't my point, Your Honor. Okay. Although I do agree with that. My point was that if the legislature is doing that and is creating a right against certain treatment, and that's unequal treatment, and that's going to give rise to discrimination, I think even plaintiff would admit you have to look at the D.C. statute here or the Montgomery County provision to know that age is a protected classification. Otherwise, I mean, you could argue as one of the ads was targeted to pets. No, but if that's a problem, so let's say someone alleged age discrimination is illegal and age discrimination is not, in fact, illegal. I agree that plaintiff definitely loses, but she loses because her claim fails on the merits, not because she doesn't understand it. Well, can I give you an example based on another type of ad targeting that's mentioned in the complaint? Some of these ads say that the reason why I'm seeing this ad is because I like pet lovers. If a pet lover came in, or I guess someone who hated pets came in and said, that's unequal treatment to me, they wouldn't have standing. They absolutely would have standing. Well, they would either have standing for the same reason she has standing or they lack standing for the same reason she lacks standing. But if the reason they failed is because there's no law against hating pet lovers, that's a merits problem. That's not a standing problem. Okay, well, I respectfully disagree, but I'm willing to. What case says that is a standing problem? Well, in all of the cases that deal with statutory rights, the court still will look to the nature of the statutory right because standing depends on the nature of the injury. Okay, let's assume I disagree completely with that. Okay. So the second question that I have is, you also have to assume that the analysis here is literally the same. If instead of checking a box that says no old people, your client had checked a box that says no black people, right? From a standing perspective, those are identical issues. Perhaps, but I would argue that what it takes to allege stigmatic injury might be different in those two cases. Sure, but from a perspective of all of the, like, whether you're denied unequal treatment when you don't see an ad that maybe you want to see, maybe you didn't. Sure, from the information and housing access, yes, I would say that those are identical. Okay, so let me give you this hypo then, which is sort of similar to the one that your colleague did, but with a different twist. So assume that you have a town with 10,000 people, and assume you have a real estate company that has the budget to send flyers to 2,000 of the town's 10,000 residents. So under this hypo, four-fifths of the town is not getting a flyer, one-fifth of the town is getting a flyer. And before they send them, they have a marketing committee make sure, don't send any of these to black people. Just make sure that none of the, we've only got a budget for 2,000 people, but we only want white people to get these ads. Get ready to pull all of the black people out. Are you saying that not a single person in the town would have standing to challenge that, including black people who are actively looking for housing? No, Your Honor, and there are two reasons, I think. One is, I still think we have to distinguish between stigmatic injury, which is a dignitary harm, and economic or informational injury, which I think is different. And so I don't want to talk about, I'm happy to say that the stigmatic injury in that case seems a lot more palpable to me than what is alleged in this complaint. How? Well, the only thing that's alleged in this complaint on stigma is on page, paragraph 104 of page JA45, and it's a conclusory resuscitation of the discussion in Heckler v. Matthew that says that the general public, plaintiffs, and members of the proposed class have been harmed by virtue of being segregated, classified, and treated in an unequal manner by defendants. I don't think that there's any factual substance to that allegation that distinguishes plaintiff's injury from the general public's injury. So in this case, I think you have an abstract stigmatic injury of the type that under Allen v. Wright is not permissible. But to go back to the informational side of your hypothetical, I would say, I'm not sure I got all of the facts of it, but it sounds like in that case, the information is actually limited. There are only a certain number of flyers, and in not getting those flyers, the plaintiff or the potential plaintiff… Yeah, four-fifths, they don't have a budget to blanket the kind of flyers. They're going to send it to one-fifth of the residents of the town, and they systematically screen out people based on the protected characteristics. And in that case, it sounds like the opportunity to learn about the property is being meaningfully hampered by not being eligible to… Oh, no, no. They're on apartments.com. All of that other same stuff is true. You can Google them. You can find them on apartments.com. But they've only got money for 2,000 physical mailers. And then the plaintiff does not receive one of those mailers. But what is the plaintiff doing with respect to apartments.com? Are we assuming that the plaintiff has the ability to receive information about these opportunities? Yeah, everything about this – literally, this case is exactly the same, except it's race, not age, and it's physical flyers, not Facebook ads. Nothing else. Then I think the stigmatic injury analysis could be different, but the informational injury analysis would be the same. And I think it's very important here to go back to the allegations in the complaint about the plaintiff's search. If you look at 14 and 15 of the JAA, or 40 through 45, there are no allegations about what exactly plaintiff was doing, even what vaguely plaintiff was doing. And I guess my question – I take your point, and I think you're quite right that her allegations are fairly thin. But then I'm thinking about the way your standing theory works. I guess my question is – well, her complaint doesn't say it. In your view, to the extent you are arguing that her complaint has insufficient information about what she actually did, what sort of information could cure the standing problem you have identified? I think information that makes it plausible that it was difficult to receive this information that she's looking for through other means, including the means she attempted. I think that would help to show that her housing search was actually hampered by… What if she alleged – I was thinking about – what if she alleged that there was an ad, a special, that you only advertised on Facebook? You would agree she would have standing then? There might still be a causation problem. You see these on podcasts or on the web sometimes, right? People who click this link. She has standing then? In the context of Facebook-targeted advertising, there may still be a causation or redressability problem, but I do think that would be injury. If there's information that she wasn't able to get otherwise, that would at least be concrete injury. You might still have a question about whether it's particularized to her. Because, again, there's really no direct interaction between her and defendants. Her counsel said that defendants came to her. That's not true. It's not supported by the allegations. And I think the Griffin case that Mr. Taylor mentioned actually is helpful in figuring out what it means – to go back to your question at the outset to Titans – to be personally subjected to something. In that case, the opinion for the court said that personally subject means direct interaction. So if I'm passing someone on the street and they don't hand me a flyer, that's direct interaction. If I go to their website and their website tells me something that's false, or if I ask them for information… Wait, go back. Why isn't this precisely the equivalent of passing someone on the street and they don't hand me a flyer? I'm scrolling through my Facebook feed. Well, there's 1,000 people scrolling through their Facebook feeds, and some of them get this ad and some of them don't. Why isn't that exactly like I pass someone on the street and they hand some of us flyers and they don't hand others those flyers? We have no reason to think from the complaint that the plaintiff was in the position of someone passing someone on the street because we don't know… It's a person on Facebook. Or on Twitter or on TikTok or on any other online platform where there's a feed. Again, I literally don't know why that's not exactly the same as a person walking down the street. Well, there are, I think, by the complaint's own allegations, dozens of ads that are being challenged here, most of which are for properties that plaintiff doesn't even have an interest in. And that's just the defendant's advertising. There are also many other housing advertisers who advertise on Facebook. Sure. And that is maybe an argument that you could have made a targeted motion to dismiss some of her claims for insufficient allegations against some of the defendants. But I don't understand how that's a blunderbuss attack on all of them. Because there's no reason to think that she was coming so close to being in contact with defendants, except for their alleged targeting of the ads, she would have seen these advertisements that interested her. She might have seen other advertisements instead. She might not have been on Facebook except for five minutes a day and saw maybe two advertisements total in that period. I might only walk past the mall for five minutes a day. And if there's a guy handing out flyers during that five minutes and he doesn't give one to me, I don't know why that matters. Well, in that case, you're in direct contact with that person. It would seem to me that your concession may be too broad because it seems to me merely passing, as Judge Hyten said, may be totally analogous just to the passive activity on Facebook. It seems to me what the hypothetical would have to include is where the person passing asks for the flyer, reaches his hand, and the person looks at him and denies it to him. Then it's personalized. But if he's just walking by and has not handed it, it seems to me that you're more analogous to your argument that there is no economic, no concrete harm or particularized harm because somebody is walking by and may or may not have an interest. It's where they reach out and say, I'll take a copy of the flyer. And the person who's handing out flyers looks at him and withdraws it. Thank you, Your Honor. I appreciate that. I'm trying to address these hypotheticals, which I confess I hadn't really thought of before today, too, kind of on the fly. So I appreciate that clarification. You could also imagine the person who crosses on the other side of the street from this person handing out flyers. I don't think that would be direct interaction either, but I think it would be closer to what the position plaintiff was in here. I think it also is incredibly important in this case that the information that's in the Facebook notices that plaintiff is complaining about not having received are just the information that these properties exist and that their property companies have websites and there are links to those websites. I think the plaintiff's own complaint in paragraph 7 says that she would have reviewed the defendant's websites. And that's how, presumably, she ended up being able to identify six properties that had the type of housing at the price point that she says she was interested in. Nothing in the advertisements themselves actually contain that information. And so even there, they do not contain the information that would have helped her on her housing search. All they would have provided was one way, a random way, to access the defendant's websites. Sorry, just looking at my notes here. I think the more analogous case on the competing on an equal playing field rather than receiving an online advertisement would be it's very easy to see how in cases like Bakke and City of Jacksonville, not being able to compete for a government contract or a spot at a university that interests you is not being able to compete on an even playing field for the benefit you're interested in. Here, however, the plaintiff's own admission today was that the ultimate benefit was housing. And there's no allegation that there was an unequal playing field for actually receiving housing. The only allegation is that there was an unequal playing field for receiving the particular Facebook advertisement that we don't have any reason to think was necessary in order to find out about the housing or apply for property. It would be more akin if we took the City of Jacksonville case and instead of there being set aside, there was a special outreach program for minority-owned businesses where they provided the same information that was broadly available about the government contracts that were being handed out, but also targeted outreach to a particular part of the population based on race. I don't think that that would give rise to concrete and particularized injury in fact. Let me preface this by saying I fully recognize this is not this case, but I'm just trying to make sure I understand how the standing analysis would work here. Imagine a situation where there's something that's in extremely high demand, right? Taylor Swift tickets or something like that, right? And so they advertise it in a whole bunch of ways, but it turns out everybody knows this thing is going to sell out instantaneously, right? And so the ability to access the portal in a timely fashion is critical because in reality, if you don't get these in the first five minutes, you're never going to get them, right? And imagine they sent the advertisements to the young people two minutes before they sent them to everybody else. Now, the information is available to everybody. There's a website that tells you you're going to be able to order tickets on a certain day, but you can't do it until you have this link. You need this link. And they send that link to people two minutes earlier than another group of people, knowing full well that these are going to sell out in 30 seconds. Would a person who didn't get the ad have standing then? And if so, why? And if so, why is that different from this? I think probably, Your Honor, based on my understanding of the hypothetical, and the difference that matters is that there is reason to think there's a meaningful advantage given to one segment of the population that another segment of the population is being denied. I don't think of getting a Facebook ad as really being a meaningful advantage, because especially when they're untargeted, they're usually of no relevance whatsoever. I think in this case, there are no allegations that these apartment buildings filled up before plaintiffs found out about them. And that's usually the new apartment buildings with lots of vacancies, presumably. That's not usually how real estate works. It's not Taylor Swift, much to my client's disappointment. But I think that that's really the key difference there, is that there is a tangible and particularized disadvantage in getting the benefit at issue that's present in your hypothetical about Taylor Swift, and is present in college admissions cases, in government contract set-aside cases. And here, given the non-rivalrousness of information, the fact that information is accessible all over the place, especially in today's digital era, and the lack of any allegations that, despite that common experience, this particular information was not available, or that better information would have been available on the Facebook ads, here we don't have any of that. And so it's entirely implausible to think that not being eligible to receive a particular Facebook notice for these houses is what caused plaintiff, or in any way caused plaintiff, to be disadvantaged in her search for housing, which, of course, ended in 2019 when she purchased a home. And, of course, I will also just note that Facebook, according to paragraph 40 of the complaint, has revamped its entire way of advertising housing. So obviously there are damages claims in this case, too, as well as injunctive relief claims. But I don't know how a request for prospective injunctive relief could be one that plaintiff has standing for, given that she's not in the market for housing any longer, and Facebook has completely changed the way it handles these advertisements. The other point, Your Honor, we've talked a lot today about how the allegations in this complaint are pretty thin. I think it's important to keep in mind the procedural history of this case, because this was the amended complaint that plaintiff filed here after seeing defendant's original motion to dismiss on standing grounds. And it came also after the dismissal of plaintiff's lawsuit against Facebook, raising a similar sort of theory based on ad targeting that was also dismissed on standing grounds. So any allegations, I think, that plaintiff could have made, I think she was on notice that she should make in this amended complaint. She didn't leave the file a second amended complaint. So I think that given her opportunity to put in any allegations that she was capable of making, and the fact that these are the best she came up with, we would ask that the district court's judgment be affirmed. Thank you, Mr. Taylor. Thank you, and may it please the court, just a few quick points in rebuttal. Number one, Judge Haytens, you're absolutely right. You assume the merits for purposes of standing. It might be helpful if you- Oh, yes. Thank you, Judge Haytens. You're absolutely right that you assume the merits for purposes of standing. I don't think that's much of an assumption here, because there was clearly a statement that the defendants made to Facebook that explicitly preferred race. I'm sorry, age. The second point is, Judge Haytens, you're also correct that the ramifications of embracing the theory advanced by the other side is that it's really open season on any kind of targeted ad campaigns online, excluding people based on protected characteristics, be it age, race, political affiliation, whatever it might be, so long as there's a website that's sort of open to all, that any kind of targeted advertising beyond that, no problem. I think that really just underscores the consequences. My friend tried to suggest- Can I ask you about, talking about assuming the merits, if we were to conclude that this were an injury, would we have to send it back for a causation analysis, like still on standing, not getting to the merits? Your opponents seem to also be making or claim to have arguments about how there's a missing link to substantiate the theory that your client would have ever seen these ads, given if age and location are the only limits. You know, was she getting any ads for housing on Facebook? How many were possible? How long was she on there? You know, that these would have ever popped up. We can't assume. I mean, we have to grant you the merits, but there seems to be a standing causation link for assuming that if the age limitation had been on there, she would have received the ad. It depends on the nature of the injury. The injury that we're relying on here, to be clear, is not the ultimate denial of the benefit, be it the ability to obtain housing or even information about housing. It's unequal treatment on account of protected status with respect to a person's ability to obtain housing. So you're saying your argument is not ultimately that she was denied information. It's that she was treated differently. With respect to the information that was pertinent to her. That's correct. Well, why do you need to have information that's pertinent to her if the denial of the information is not the injury? If the injury is just, I was treated differently. Well, I think there are cases that simply being subjected to unequal treatment by a government or a private party based on a protected characteristic is itself an injury. No, there are cases that say that can cause an injury. You misquote the cases. They say that can cause an injury. Well, I think what those cases say is that a discriminatory practice can cause a concrete injury. You have to be personally subjective. Like being forced to compete on unequal terms. The injury is being forced to compete on unequal terms. That's right. But there's also, my friend tried to distinguish the race-based hypothetical by saying it's different based on kind of a dignitary harm distinction. I would just note that this court has foreclosed that argument in the Griffin case. That was a case, again, involving disability. And Judge Wilkinson said it is true that the complaint does not include the phrases dignitary harm or stigmatic injury. Ours does, by the way. But such a ritual incantation is unnecessary. Dignitary harms are readily inferred by allegations of unequal treatment. The court simply held that the dignitary harm wasn't suffered there, not because there was no kind of face-to-face interaction, but rather because there was a legal barrier that was akin to the geographic barrier in Allen v. Wright that prohibited the plaintiff from being able to access the services at all. Here, there is no barrier that prevented the plaintiff from being able to search housing, obtain housing opportunities. And so I think it's meaningfully different. My friend also said that the only way in which an informational injury could sort of bear on the analysis is if the information were categorically denied. The plaintiff was categorically denied an ability to see the information. That's not correct. Again, the injury that we're alleging here is the ability to receive information on equal terms. And as Judge Wilkinson pointed out in the Griffin case, when that information has some relevance to the litigant, that's a concrete interest. And if there's unequal treatment with respect to that, I think that has to be an injury. And my friend also sort of made a casual remark that there's no material advantage that is conferred on people by these ads. That just defies common sense economic logic and the defendant's own actions. I mean, the only reason you purchase the ads and pay money for them is because they affect the marketplace, reach people they wouldn't otherwise reach, cause them to buy the product that they wouldn't have otherwise bought. And it's certainly a fair inference that if you're in the market, and it's been distorted in this way to the benefit of people who are different from you only based on a protected characteristic, that you suffer harm. And Judge Niemeyer, just to reiterate the point I was making earlier, or trying to make about the price case that you joined, it's a 1996 decision. I'd be happy to put it in the 20HA if you thought it relevant. But there, the white police officers conceded that they were not eligible for the promotion, just based on their merit. But the mere fact that it was a discriminatory policy worked some harm on them. And that was an Article III injury by itself. And here, and I think that's an answer to your question, Judge Rushen, but here the plaintiff says the opposite, that she cared about the information, wanted to receive it on equal terms, and would have done something with it in the real world. And so I think the narrowest way to decide this case is just to say, at least on these facts, when you're alleging a particular unit that you would have competed for, but for this clear discrimination, that just has to be standing. Otherwise, you're opening the door to all kinds of profound damages. Thank you, Mr. Taylor. We didn't ordinarily come down to greet you. That's a tradition of the Fourth Circuit, and we always look forward to that and thanking you for your arguments. We're still following the protocols, and accordingly we won't come down, but we'll thank you from the bench and extend our hands in some kind of abstract way. Enjoyed hearing your arguments. We'll proceed on to the next case.
judges: Paul V. Niemeyer, Allison J. Rushing, Toby J. Heytens